The case on our oral argument calendar today is Hughes v. City of New York, No. 162557. Good morning. May it please the court, Joshua Moskowitz for the appellant Everett Hughes. I'd like to begin with the 14th Amendment claim. By not providing a hearing or any opportunity to contest the ban from the New York City Public Schools before it was imposed, Everett Hughes was deprived of his liberty under the 14th Amendment and in violation of the requirement that there be due process to impose such a deprivation. This court's decision in Velez directly controls here. Velez held that the New York City Schools Chancellor is a high-ranking... But all Velez says is that it is not automatic when something like this happens that an ex post hearing is sufficient. That is, Velez says, and I think it applies here, and that probably the now-celebrated Judge Donnelly may have erred in saying that it was automatic. But all that gets us to is then whether under Matthews, on the facts of this case, an ex post hearing would be sufficient. And that becomes more difficult because this is a case like Siegel where your client is at will, and therefore the cases where we have said that ex post is not enough don't apply directly. So the point you have to make to us is, okay, it's an open question, but under Matthews, why isn't the city's interest in getting rid of at will people quickly more important than having an ex ante hearing? First of all, Judge Calabresi, I'll say that in Velez the court ultimately concluded that some type of pre-deprivation or pre-termination hearing was required. And if we apply... Was Velez an at will case? Velez was in fact the analogous of an at will case. Although the argument was made that Amy Velez had some type of property interest in her position on the board, the court held that that was not correct and rejected that argument, found that under Supreme Court precedent, an elected official does not have a legitimate expectation of continued position, and therefore there was no protected property interest. So I see no distinction between Velez and this case, although the defendants argue that it was essentially a for cause case. I don't believe that that's correct. If the Matthews balancing is undertaken, what I'll say is that in the cases in which, like Siegel and like Velez, there was some, excuse me, unlike Velez, there was some type of pre-deprivation hearing or process afforded. So in Siegel, the school's chancellor had applied its, I believe, C-31 procedures, which involves a step that's taken before the deprivation. A panel is convened to hear the evidence and a recommendation is sent to the chancellor. That wasn't done here. In fact, nothing was done here before the deprivation, before the ban was put into place, and the chancellor did nothing to afford any hearing or opportunity to be heard after the ban was put into place. So I don't believe that Siegel dictates that there should be no type of pre-deprivation hearing. In fact, I think Siegel suggests just the opposite, that it has to be something. Perhaps it's not a full-blown hearing, but there has to be something. I also think that the situation with the at-will employee in Siegel, as we've argued in our brief, is different than this case because that was an at-will government employee, and I think that the government has legitimate interest in being able to act quickly to remove an employee from a school that they think there's an issue with. Here we have a contractor. Mr. Hughes didn't work directly for the Department of Education, so the government's interest, the DOE's interest in this case, might have been legitimate to say, he needs to be removed from that school immediately and we're going to hold a hearing meanwhile, but that didn't require them to immediately ban him from forever working in the DOE again, and it didn't require calling his employer to say he can't work for the DOE. Those things didn't in any way carry out the government's interest in making sure that he wasn't still in that school while some type of process took place. The fact that he was not a government employee and was just a contractor working for an entity that contracted with the Education Department strikes me as attenuating his own property interests and making this very much unlike a medical license or some other situation in which one has a well-established interest. Doesn't it make any difference here that he was at some remove from the department? I don't believe it does, Your Honor, because his interest here is his liberty interest in being able to carry out his occupation. The ban that was- But you define his occupation as working for the New York school system because that's who he had worked for before and that's his primary calling card now that he's no longer an employee. But why couldn't he be consulting for other kinds of school systems or not the New York City school system but on Long Island or some other associated place? Your Honor- In other words, the distinction that you have made is there, but does it cut for you or against you? I believe in this case the liberty interest that was deprived was Mr. Hughes' ability to carry out his occupation, which is, as we've defined it, and I believe it's accurate to say, an expert in the New York City public schools. That's where he had 30 years of experience before he retired. All of the consulting firms that recruited him after he retired specifically worked for the DOE and recruited him because he had this experience and knowledge in the public school system here. He lives in New York City. This is where he works. That is his occupation. I don't believe that the- This was just his strength, but it wasn't his occupation in the same way, it seems to me. Well, I believe it's more than his strength. I believe it's his expertise, and following the chancellor's ban on his working in the Department of Education, he has been unable to secure any type of work providing educational consulting services to organizations that do any work with the DOE out of fear that that will somehow be taken as a problem with their continued contracting with the DOE, principals who work with the DOE and have their own ability to hire consultants. You're focusing on the New York City schools in all of those efforts, right? Does the record reflect whether he has attempted to get work consulting for school systems adjacent? There's not an allegation in the complaint at this posture of the case to that respect, and I will say that the New York City public schools dominates the area in which Mr. Hughes works and lives in New York City. I think it's appropriate for us to define his liberty interest as being deprived or he is unable to do that work. What is his expertise? Is he saying in the complaint exactly what it is that his expertise is with respect to the city schools? He was known at the time he retired as a turnaround principal. He had had tremendous success in rehabilitating failing middle schools. Specifically, he worked at IS 292 in Brooklyn before he retired. He had provided some of his consulting work there after he retired. That was his expertise. I see that my time . . . That's okay. Judge Calabresi has a question. If I may, I'd like to turn to the First Amendment question. My question is this. Okay. I'll assume that Judge Donnelly was incorrect in saying Garcetti applies because what was done was . . . or what was believed to have been done was clearly outside of employment. It was supposedly fomenting a demonstration, which was valid. I will also go along and say that under Heffernan, it doesn't matter whether that was actually what your client was doing, but if that's what they believed. My question goes to the fact that your complaint says that they banned him for that . . . for their belief in that and also for the belief that he fomented the riot and damaged the superintendent's car. Now, my question is if they . . . On 12b-6, do you have a right to focus on one of these parts of your complaint and say they may have fired him for this reason and that under Heffernan is wrong? Or do they have on 12b-6 the right to say since he alleged all three, we fired him on all three? Because if you had only said one of these, then I think I'd have to say all their defenses . . . qualified immunity, we had other reasons and so on, couldn't be dealt with on 12b-6. It'd have to go further. But given what you said in your complaint, I'm . . . Being what? Given what thing said in the complaint? That they fired him because they wrongly believed that he had fomented the demonstration, which is a valid . . . Fomented the riot. Fomented the riot. But all three, he said, arranged the demonstration, which is protected, arranged the riot, which is not, damaged the superintendent's car, which is not. And it's the presence of those two other things that are troubling to me. This is the point, Judge Calabresi. Those two other things, the riot and the damaging of the car, didn't occur in the complaint. Well, none of the . . . I mean, oh . . . No, so the complaint, I believe, and just to address your point, the complaint, I believe, states that those two things were, in fact, false accusations. There was no riot and there was no damage to the car. So, the complaint alleges that the Department of Ed administrators contacted Mr. Hughes' employer and said he did these things. He orchestrated the demonstration, led the riot and damaged the car. But leading the riot and damaging the car didn't happen . . . How is it a First Amendment violation if they banned you in the belief that some things that didn't happen, that don't implicate the First Amendment, had happened? And the reason, I think, on a 12b-6, where we have alleged that those two other things that aren't First Amendment protected activity, riot and damaging a car, didn't occur, all it leaves us with on a . . . Well, I understand, but you don't allege that they didn't believe that they occurred. May I interject a better answer than you have given to Judge Calabresi's question? Please. I'm very troubled by this point and I'm looking forward to your adversary's argument because I think Judge Calabresi is referring to argument which is made on page 30 of the red brief . . . . . . wrongly believed he had done was that he had, I'm quoting, organized a riot and led others to damage the superintendent's car. And what the defendant argued and Judge Calabresi is asking about is that doing things like that, organizing a riot and leading people to damage a car, are not protected by the First Amendment. However, the defendant refers to JA-16 here and I have a strong impression that the defendant has misled the court in this argument. And I hope I can be persuaded by the defendant that the defendant has not misled the court. Because if you look at the cited passages, they don't say what the defendant characterizes them as saying. It's not a matter of your argument, those things didn't happen. The question is what did you allege? And if you look at the passages that are referred to in JA-16, the complaint doesn't say that Farina thought he had organized a riot or led others to damage the car. It says that he caused, that Farina believed based on the accusation she heard from the superintendent, that he caused a riot and that he led a group of people who damaged the car. And there's a big difference between causing a riot and organizing a riot. Because if you organize a riot, you are encouraging people to riot and that's not protected by the First Amendment. But caused a riot doesn't, it leaves open the question, you can cause a riot by saying, you know, look what a terrible injustice has been committed here. You should all write letters of protest. But you get the crowd worked up and they riot, you have caused a riot.  And with respect to the damage to the car, the complaint says he led a group of people who damaged the car. The characterization in the defendant's brief is he led others to damage the car. And there's a big difference between them because you can lead people who are demonstrating, that's protected by the First Amendment. And the fact that they go on and damage a car doesn't mean that you were leading them to damage the car, which might not be protected. So I think that, you know, what really happened, we don't know. But to the extent that we are governed by the facts alleged in the complaint, the complaint does not allege, as the defendant argues, that the superintendent believed he engaged in activity which is not protected by the First Amendment. And if the allegations are all in belief in things which would be protected by the First Amendment, then we're back to Heffernan and the mistake with respect to Garcetti. And that becomes an important argument. But that will be addressed to the other side. Thank you. Thank you very much. You have two minutes for rebuttal. Mr. Lee. So I hope you can convince me that you did not mislead the court. And in addition to the passage on JA-16, which you referred to in your red brief, although it doesn't say what you said it says, there's also a passage in the complaint on J-10, which is consistent with the part on J-16. It says on J-10, in paragraph two of the complaint, that Hughes learned that Joyce Stallings Hart, the superintendent, had falsely accused Hughes of orchestrating the demonstration. That's different from orchestrating a riot. Orchestrating the demonstration is protected. Causing a riot, which is different. We don't know. It's ambiguous as to whether there's intention or whether the riot resulted from properly protected stuff. And leading a group of people who damaged her car, not leading people to. Your brief was misleading the court as to what is pleaded in the complaint? First of all, good morning, Your Honors. Good morning. Thank you. I should have said that myself. I don't think so. But even if we were to take the allegations that are pled in the complaint where it says orchestrated the demonstration, caused a riot, led a group of people who damaged. You don't dispute that organizing a demonstration is protected by the First Amendment, do you? No, Your Honor. We don't. But the intent, the Heffernan piece doesn't come into play because Garcetti controls this case. No, Garcetti doesn't control it. If somebody has been sent to look at something that is going on and then steps outside and organizes a demonstration, that certainly wasn't part of his job. I mean Garcetti goes – Garcetti is a doubtful and dangerous opinion, but it goes only so far. How far are you going to push Garcetti? Your Honor, we're not pushing Garcetti. This is a direct application. And let me explain why. I'm sorry. I'm sorry. Yes. I want an answer to whether you have misled the court because it seems to me that you seriously distorted, purporting to characterize the complaint as pleading that Chancellor Farina believed he had committed acts which are not protected by the First Amendment. You used words which are not the words of the complaint. They were, it appears to me, carefully and judiciously chosen to alter what was said in the complaint where the complaint said he led people who damaged a car. You changed it to he led people to damage a car. That's a big difference on the issue we're talking about. So can you persuade me that this was not a deliberate attempt to mislead the court? Again, Your Honor, that was not the intent to mislead the court. We cited the passage. We weren't hiding the ball on what the plaintiffs were alleging, and it's still – Were you able – you cited JA-16. You must have been looking at JA-16. How does it happen that the thing that you wrote is so artfully changed from what is written in the complaint on JA-16? But the intent was not to mislead the court, Your Honor. We cited the passage. Well, I'm glad it wasn't. I'm glad it wasn't. Okay. And to get back to Judge Calabrese – But it did mislead the court, whether it was – Yeah, it certainly misled me in the questions that I was asking him and saying, if you pled that, then don't you have this consequence? So it certainly misled me. I'm not, you know – It misled me, too, until I looked at JA-16. He didn't say in his complaint what they're saying he said. Well, again, we provided the site. You asked me the question. I've clarified. The answer is we are very, very sorry. We didn't mean to mislead you, even if we did. Yes. That's the best answer you can give, so give it. Yes, that is the answer, Your Honor. But to get back to the Garcetti point, this is a Garcetti situation because, unlike the hypothetical that you had sketched out, Mr. Hughes did not just happen upon this demonstration, decide to join it. He was sent, and the complaint specifically alleges that he was called that morning and he was told to report to IS-292 because there was a demonstration occurring. This is a situation where – You're saying that any time – that under Garcetti, any time the person is where he is, because he's been sent there by his employer, it then follows that any First Amendment activity he engages in at that place is not speech as a citizen under Garcetti but is speech pursuant to his employment because he's there because he was told to go? No, Your Honor. It's not just that he was there. He was there to address the demonstration. To observe. To observe. Again, that's a very important change in what is going on. The statement was he was sent to observe. That's not the same as to address. He was sent to observe. You go? His job was to go there and watch and presumably report. What allegedly happened was that the superintendent believed that instead of doing that, he stepped outside his job and addressed, took part in, did something in a demonstration, which his First Amendment protected, and on the basis of that belief – this is what the complaint is – he was fired. Hefferman says even if a belief is wrong that is protected, how was his doing any of these things conceivably part of his job? Now, you know, I'm not saying that he couldn't have been fired maybe later because he stepped out of his job, but that would have to be something that can't be – isn't before us, isn't in a 12b-6. It's something that might come up as a defense later. But it's precisely because he did something that was outside the job. Well, Your Honor, that's not the material question whether he stepped outside of his job because he was there. As I was trying to articulate, he was – his supposed speech there, what he alleges the defendants believed, it owes its existence to his being there to be – Everything you do as an employee, when you're an employee, can be said to owe its existence to your employment. If you read Garcetti that way, it would be impossible for anything that you did within your employment, in cases which we have held is outside the employment because it was something that the employment didn't require. Indeed, maybe for bad, would be covered by Garcetti, and that's not what has happened since Garcetti. Well, Your Honor, this – but this is the limiting line. He was sent there as – to be a DOE, his nonprofit representative, to be there on site. He was not, for example, sent there to look at the IT system or develop a curriculum. In those hypotheticals, if he had been sent there to do that, he happened to see that there was a demonstration, and he decided to join, that would be a closer call, and it would be, Your Honor, a different case. That's not what is alleged in the complaint. Suppose he was sent to observe, and he said, my God, what is going on is really amazing. I've got to lead it. I'm going to come here and give a speech saying, let us go and march on the schools or do something of that. Are you saying that that is part of what – because he happened to be there because of his employment, that what he did thereafter was part of his employment? Yes, and I think – I'm going to try to explain it through Garcetti because Garcetti, similarly, he was a prosecutor. His job was to write memos, assess cases. He came across a case that he believed his office should drop, and he decided to write a memo criticizing his office's approach to that. Very similar to your hypothetical. He saw a case. Who did he write the memo to? He wrote it to his supervisor, and he said – Exactly. He wrote it to his supervisor. But it didn't go out in public and say, look at what is going on, and that's completely different. He wrote it to his supervisor. If he had picked up his cell phone and said, you sent me to observe, there is now a demonstration going on, which I think from being sent to observe is a correct thing. Should I go and join it? That action might well be covered. It's like saying something to the supervisor. But that's not what happened. Your Honor, I don't think it makes a difference still because it doesn't matter what the reaction of the employer in Garcetti, it was the prosecutor's office. Here, it's DOE. It doesn't matter what the reaction is if he was speaking as an employer and he was there that day because he was told to be there as a representative. Let me give you a hypothetical. Supposing that he – same facts as ours. He was sent to observe the demonstration. And let's say that he's there observing, but for a while nothing much is happening. And he says, well, here I am. I'm not doing anything right now. I'm going to call up my boss or somebody and complain about something that's been on my mind. And he calls up his boss and complains about it. He was doing it from a place where he had been sent by his employer. You seem to be arguing that because he had been sent there and he did the speaking when he was there, that means that Garcetti is involved. So he calls up his employer and he says, you know, you were completely wrong in what you did the other day. And the employer says you're fired. Garcetti covers that because he was at the place where he had been sent by his employer? Your Honor, what is he complaining about? Is he complaining about – Something that happened a week ago. Yes, because his – because, first of all, Garcetti tells us that the First Amendment does not invest in its employees with the right to perform their jobs however they see fit. So if he was sent – Having been sent there by his employer, anything that he does at that point – Your Honor, okay, I see your point, Your Honor. It's not just that he was physically there. It's that he was sent there to address this very specific problem, the fact that they were anticipating, and it turned out correctly, that there would be a demonstration at the school. So he was called up that morning, and they said, Mr. Hughes, we need you to be at the school to be our representative. As the complaint alleges, he is – he specializes – What does the complaint allege? He specializes supporting DOE principals, and part of the contract that his employer had with DOE was to provide support services to principals. So it is not at all a leap to understand that he was sent there to be DOE's representative. Are we supposed to interpret ambiguity in the complaint in the light most favorable to the defendant? No, I'm not saying – but I'm saying it's very clear from the complaint why he was hired and why he might have been sent there. He was not sent there as a third-party observer. He was hired as a contractor to work on behalf of DOE. That is why he was sent there that day. Point to what it is in the complaint that makes it clear. That he was a DOE contractor? What he was doing was something that he did as an employee pursuant to his job duties. Point – what is it in the complaint, because I haven't found it. And you find things in the complaint that I have been unable to find there. Your Honor – sorry. Where is it? The controlling question isn't so much was what he allegedly did something that his employer was happy about. It's the fact that he was sent there in the first place by his employer who was with a – who had a contract with DOE. He alleges that he was fired because his employer believed that he had done something which, had he done, would have been outside of his employment and protected by the First Amendment. You know, if you read the complaint, that's what it seems to say. And it seems to allege exactly that he was fired because he did something which was not Garcetti covered, but was outside of the employment. And yet what he did was First Amendment protected. Now, reading that complaint, how can we say that – and that's quite plausible – how can we say that that doesn't get both beyond Garcetti and covered by Heffernan? Well, Your Honor, I don't think it goes beyond Garcetti. But on the Heffernan – I know you don't. Right. Okay. Thank you. Very good. I have another question, which is with respect to municipal liability. Why – with respect to the chancellor, why isn't an action taken by the head of a department? Why doesn't that represent the policy of the department? I understand perfectly well that under Monell, if a lower-level employee does something, that doesn't result in liability of the municipality unless it is done pursuant to municipal policy or whatever exactly the standards are stated in Monell. But it's a little different when the head of the department – I think we have a number of cases. In fact, I think I've written some which say that when the head of the department, the chief of police or somebody like that, takes an action, that is department policy because it's the person who has the power and authority to make department policy. So why does the city escape liability to the extent that the actions were done here by the head, the chancellor of the department? Your Honor, are you asking about the qualified immunity or whether – No, not about – the city doesn't benefit from qualified immunity. Right, right. So – Under Monell, unless what is done is department policy, is municipal policy, why aren't the actions of the head of the department, the chancellor, why don't they represent department policy that renders the city potentially liable notwithstanding the Monell precedent? I guess, Your Honor, I'm not sure that we said that she was not a policymaker for the purposes of Monell. I think for the purposes – if you're – Why doesn't an action taken by the head of the department – here, the head of the department said, this person is banned from working for the city, according to the complaint. Right. Why isn't that department policy? She declared the policy of the department is he doesn't work for us. He doesn't come here. Keep him away. Why isn't that the policy of the city that renders the city potentially liable under Monell? Well, I think still under – moving to the Stigma Plus claim, still under Siegel, all Mr. Hughes was entitled to was that – a post-termination hearing, and he had that available. He could have sought – he could have gone to state court, filed an Article 78 proceeding. The question that is being asked, is the city potentially liable under Monell? Then whether a claim has been made out for – that a pre-deprivation was required, or whether a First Amendment claim has been made out, are different questions. But the question that is asked is, was there a statement sufficient so that the city may not be dismissed at 12b-6 because there isn't any sufficient claim of something that would make the city liable? I think that's the question, not that – Well, Your Honor, maybe I'm not understanding the question, but I think it's still dismissed because he had available all the process that he was due, and he could have gone to Article 78 to challenge Ms. Fiorina's ban. What you're saying is, I agree there is enough, but we win anyway. But that's a different answer. So you're not claiming that the city escapes liability for Monell reasons, only because you say that he got the due process he was entitled to? Correct. Then what about the First Amendment? The First Amendment – we're saying that there is no First Amendment because his conduct falls under Garcetti, and in any case, Heffernan doesn't apply here. And if we reject your argument about Garcetti, if we don't agree with you about Garcetti, what then protects the city from liability under the 1983 claim based on the First Amendment? We recognize – if Your Honor rejects our Garcetti argument and our argument under Heffernan, yes, and the city – the claim would go forward against the city. Thank you. Okay. Yes. Thank you very much. Thank you. Mr. Moskovitz, you have two minutes of rebuttal. If the panel has any questions, I'll be happy to answer them. Otherwise, we'll rest on the arguments we've made in our briefs. Very good. All right. Thank you very much. We will reserve decision. The remaining case on our calendar for today, Puest Family Trust v. Parness Holdings, is on submission. The court will please adjourn the court. Court is adjourned.